UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANGELA M. RIZZO,

                              Plaintiff,

        v.                                       1:04-cv-1507

NIAGARA MOHAWK POWER CORPORATION,
a National Grid USA Company, and
RONALD SEUN,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Plaintiff Angela M. Rizzo commenced the instant action against Defendants Niagara Mohawk Power Corporation ("Niagara Mohawk") and Ronald Seun contending that she was discriminated and retaliated against in the course of her employment. Currently before the Court is Defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56 seeking dismissal of the Complaint in its entirety.

**I.    FACTS**

Plaintiff was hired by Niagara Mohawk in 1991. Plaintiff is a member of the bargaining unit represented by the International Brotherhood of Electrical Workers, Local 97, AFL-CIO. At all times relevant hereto, Niagara Mohawk's discrimination, harassment, and anti-retaliation policies were distributed and posted in the company's North Albany facility. Niagara Mohawk's policies provide a procedure and process whereby employees can raise

concerns regarding any conduct that he or she believes constitutes discrimination, harassment or retaliation.

Pursuant to the labor contract's post-and-bid procedure, in the spring of 2001, Plaintiff applied for a Mechanic B position in Niagara Mohawk's Albany Construction and Maintenance Department. Although Plaintiff did not possess the requisite qualifications for the Mechanic B job, Charles MacGowan, the Supervisor of the Construction and Maintenance Department, awarded Plaintiff a position as a Mechanic C and instructed that she would need to obtain the necessary qualifications for the Mechanic B position within a reasonable period of time. As a member of the Construction and Maintenance Department, Plaintiff generally worked with a crew of other bargaining unit members that included a Chief Mechanic, a Mechanic C, a Mechanic B, and a Mechanic A and/or a Laborer. Defendant Ron Seun worked as a crew foreman. Plaintiff contends that Suen was responsible for assigning projects and jobs. Suen's job duties included directing and training lower grade mechanics in the everyday execution of the duties as assigned by Suen's supervisor, MacGowan. Suen Dep. at 12. Plaintiff further contends that Suen "evaluated my performance and could recommend my hiring, firing or any other type of adverse employment." Pl. Aff. at ¶ 14. At deposition, however, Plaintiff testified that Suen did not have authority to take disciplinary action against her. Pl. Dep. at 116.[1] According to Plaintiff,

---

[1] At deposition, Plaintiff was asked the following questions and gave the following answers:

Q: Mr. Suen had no authority to take disciplinary action against you, did he?
A: Technically, no. He had no authority.
Q: And Mr. Suen never did issue any discipline to you, did he?
A: He himself, no. He made attempts through the supervisor.
Q: But . . . it would be the supervisor's determination as to whether or not discipline should be issued, not Mr. Suen . . . correct?
A: Correct, yes.

Suen determined who worked overtime and received upgrades.  Plaintiff then qualified this statement by noting that "[w]hile it is true that MacGowan ultimately approved the assignments, Suen made the original call to MacGowan asking that particular crew members be allowed to work either in an upgraded position or to perform overtime."  Id. at ¶ 16.

On October 11, 2002, Niagara Mohawk management conducted a meeting with the entire Construction and Maintenance Department, during which employees were instructed on various company policies, including those related to discrimination, harassment, and retaliation in the workplace, and relationships and communications between and among co-workers.

After this meeting, on October 11, 2002, Plaintiff called Ms. Melanie Littlejohn, a member of Niagara Mohawk's human relations department, and complained about certain comments and/or conduct of Suen.  Littlejohn and Joseph Peluso, another member of the human relations department, conducted an investigation into Plaintiff's allegations.  Upon concluding its investigation, Niagara Mohawk concluded that Plaintiff's allegations were unsubstantiated.  Niagara Mohawk did, however, conduct additional meetings with Suen, Plaintiff and other members of the Construction and Maintenance Department and, among other things, reviewed the relevant company policies.  Plaintiff contends that Niagara Mohawk's investigation was deficient and that Niagara Mohawk failed to take any meaningful corrective action towards Suen, such as counseling and/or warning him about inappropriate conduct.  Plaintiff did not report any other complaints of sexual harassment.  Plaintiff was promoted to the position of Mechanic B in November 2002.

## II. STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 592 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant is able to establish a basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d. Cir. 1998).

**III.	DISCUSSION**

Defendant moves for summary judgment on the hostile work environment claim on the grounds that: (1) there is no basis for imputing Suen's conduct to Niagara Mohawk; and (2) once Niagara Mohawk learned of Suen's conduct, there were no further instances of sexual harassment. Plaintiff responds that Suen engaged in numerous instances of behavior that could be considered to be harassing. Plaintiff further argues that Suen did act in a supervisory capacity, thereby providing a basis for imputing liability to Niagara Mohawk. According to Plaintiff, Suen had input into job evaluations, made the determination as to who would get overtime or upgrades, and directed Plaintiff's everyday tasks and assignments and was responsible for her whereabouts.

"To survive a motion for summary judgment, a plaintiff claiming he or she was the victim of an unlawful hostile work environment must elicit evidence from which a reasonable trier of fact could conclude (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir.2003) (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999) (internal quotation marks omitted)). The first question, then, is whether it can be said that the workplace was sufficiently severe to rise to the level of a hostile work environment.

### a.	Whether Plaintiff Was Subjected to a Hostile Work Environment

To establish that she was subjected to a legally actionable hostile work environment, Plaintiff must show that her workplace was "permeated with discriminatory

intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 153 (2d Cir.2000); <u>see</u> <u>Feingold v. New York</u>, 366 F.3d 138, 149 (2d Cir. 2004).  To determine whether an environment is sufficiently hostile or abusive, courts examine the totality of the circumstances including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) what psychological harm, if any, resulted. <u>Richardson</u>, 180 F.3d at 437.  "[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir.2000)(internal quotation marks and citations omitted).  The workplace must be both objectively and subjectively hostile. <u>Id.</u>

  Plaintiff lists fourteen types of events that are alleged to have transpired over a period of just over one year.  For example, Plaintiff contends that Suen frequently made references to the size of his penis, and that Suen also stated that "no hole is big enough or wet enough for me;" "[o]h Angela's here, I better make sure my pants are up; or better yet, I'll pull them down and really give her something to see;" and "[t]hat is why we have Angela here, so we can bend her over and give it to her."  Plaintiff further alleges that Suen often made remarks about her breasts and repeatedly made condescending remarks about her status as a woman and a mechanic.

  Most of these events could reasonably be considered to be gender based. Although the harassment appears to have ceased as of September 2002 and it is far from a

foregone conclusion that Suen's conduct was sufficiently severe and/or pervasive so as to alter Plaintiff's working conditions, considering the totality of the circumstances, including the frequency and severity of Suen's comments, the likelihood that such comments would interfere with Plaintiff's work, and the resulting psychological harm,[2] a fair-minded trier of fact could reasonably conclude that Suen's conduct was objectively offensive. Whether Plaintiff, herself, found Suen's conduct to be offensive also is an issue of fact for a jury.

### b. Whether There is a Basis for Imputing Liability to Niagara Mohawk

Having found that there is a triable issue of fact concerning whether Plaintiff was subjected to a hostile work environment, the next question is whether there is a basis for imputing liability to Niagara Mohawk. "[I]t is only when a 'supervisor with immediate (or successively higher) authority over the employee' has engaged in the complained of conduct, that the 'employer [may be] subject to vicarious liability.'" Mack, 326 F.3d at 123 (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257 (1998)). Thus, "[t]he starting point for analyzing employer vicarious liability in a Title VII hostile work environment action is to determine whether the person who allegedly created that environment is properly characterized as having been the plaintiff's 'supervisor.'" Mack, 326 F.3d at 123. In making this determination, the Second Circuit has stated that, for purposes of Title VII, a supervisor includes not only those persons who have the the ability to take tangible employment action, such as hiring, firing, promoting, transferring and/or disciplining, but also those who have and exercise the authority to make and oversee the daily work

---

[2] Plaintiff asserts that she has sought assistance from a medical professional who prescribed a series of medications to address her job-induced medical anxiety. Although Plaintiff did not supply any medical records to substantiate this assertion, in the absence of any evidence by Defendant contradicting this assertion, the Court will assume that it is true.

assignments. Mack, at 126. "[T]he proper question in determining who was a supervisor is 'whether the authority given by the employer to the [alleged supervisor] enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates.'" Wagner v. Burnham, 2006 WL 266551 (N.D.N.Y. 2006) (Hurd, J.) (quoting Mack, 326 F.3d at 126.).

In this case, there is no evidence that Suen had the ability to take tangible employment action against Plaintiff. Similarly, although there is testimony that MacGowan might ask Suen how his employees were doing, Suen had no meaningful role in the employee evaluation process. Suen Dep. at 27-29. The question, thus, turns to whether Suen exercised authority to make and oversee Plaintiff's daily work assignments. The evidence in this regard is scant. It is undisputed that Suen was the crew foreman. It is unclear, however, what duties and responsibilities were attributable to the foreman position. At deposition, Suen testified that he was responsible for the whereabouts of his crew members and that he had a right to know where his crew members are and what they are doing. Suen Dep. at 70-72. Suen further testified that his job duties included directing and training lower grade mechanics in the everyday execution of the duties as assigned by McGowan. Suen Dep. at 12. Plaintiff states that Suen was responsible for assigning her jobs and assignments while on the job. This is a fact about which Plaintiff would have personal knowledge.[3] Furthermore, although it appears that MacGowan determined overall work and crew assignments, there is no evidence in the record tending to suggest that Suen,

---

[3] In her affidavit, Plaintiff states that Suen had the authority to assign overtime and upgrades. This, however, is an unsubstantiated assertion that was expressly refuted by Suen's deposition testimony and MacGowan's affidavit. Indeed, Plaintiff admits in her affidavit that the ultimate decision regarding overtime and upgrades was that of MacGowan, and not Suen.

as foreman, did not have responsibility for assigning tasks once a crew was at the work site. Looking at the evidence in the light most favorable to Plaintiff and considering the facts that Suen had responsibility for the crew members' whereabouts and he may have directed Plaintiff's job assignments, a fair-minded trier of fact could reasonably conclude that Suen was Plaintiff's supervisor.[4] Thus, this issue also presents a triable issue of fact.

### c.     Retaliation

Plaintiff next claims that she was retaliated against for reporting Suen's behavior. Plaintiff contends that, after her report concerning Suen, Niagara Mohawk retaliated against her by: (1) assigning her to work with Suen; (2) giving her a written warning because, in February 2003, she went to speak with Peluso concerning being assigned to work with Suen; (3) MacGowan advising Plaintiff that she could not go home sick on February 13, 2003 absent first consulting with the nurse; (4) reprimanding her for failing to report an on-the-job injury; (5) issuing a safety violation on March 18, 2003 for walking too closely to a building and walking inappropriately, causing Plaintiff injury; (6) disciplining Plaintiff on March 19, 2003 for failing to timely report to the nurse concerning the injury sustained on March 18; (7) telling Plaintiff she would have to work with Suen for overtime opportunities; and (8) requiring Plaintiff to do excavating work with, and clean out the holding tank on, the Vactron machine more than other employees.

The analysis of retaliation claims was recently altered by the Supreme Court's decision in <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 548 U.S. ---, — S. Ct. ---

---

[4] The Court is aware that the relevant collective bargaining agreement labels Suen as a "non-supervisory" employee. The mere fact that an individual is contractually defined to be a supervisory employee does not necessarily mean that the individual cannot be found to be a supervisor within the meaning of Title VII.

(June 22, 2006) ("White").  In that case, the Supreme Court made it clear that retaliation can extend to actions that are unrelated to employment and/or occur outside the workplace.  Id. (slip opinion at 1).  Thus, retaliation can be found based on non-employment related conduct.  More relevant to this case, the Supreme Court held that "the [anti-retaliation] provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant.  In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Id.  It remains the law that trivial incidents are insufficiently material to support a claim of retaliation.  Id. at 13.  Thus, there remains a materiality requirement.  The issue focuses on whether the employer's actions are sufficiently material to dissuade a reasonable person from complaining.  This reasonable person standard, however, must be analyzed under the particular circumstances facing the plaintiff.  Id. at 14.  As the Supreme Court stated, "[w]e phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters."  Id.

With the Supreme Court's decision in White in mind, the Court will now address Plaintiff's retaliation claim.  The fact that Plaintiff was reassigned to work with Suen could, in certain circumstances, dissuade a reasonable person from complaining of discriminatory conduct.  There is insufficient evidence in the record concerning the circumstances of Plaintiff's job to conclude as a matter of law that being re-assigned to work with the person who is alleged to have created a hostile work environment would not dissuade her from complaining in the future.  In light of the small work crews of which Plaintiff was a part and the fact that Suen may be considered to have had certain supervisory authority over Plaintiff,

a fair-minded trier of fact could reasonably conclude that re-assigning Plaintiff to work with Suen constituted retaliation. This conclusion is further supported when considered in connection with Plaintiff's claim was she was required to operate and clean out the Vactron machine and the other allegations of retaliation, which will now be discussed.

Plaintiff contends that she was required to operate and clean out the Vactron machine, which is the most onerous job in the Department. Plaintiff states that she was often denied help in operating the Vactron machine. Plaintiff admits that she was not the only crew member required to perform this task. She does state, however, that she was assigned the task more often than others.

Contrary to Defendants' argument, a reassignment of duties where both the former and present duties both fall within the plaintiff's job description *can* constitute retaliation. Id., at 16. "Common sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." Id. "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Id. (internal quotations and citation omitted). The record evidence suggests that operating the Vactron machine is a particularly onerous and arduous task and that Plaintiff was required to use the machine more often than others. The record evidence further indicates that she was required to operate the machine alone, whereas other employees may have been permitted help. Based on these facts and the totality of the circumstances, a fair-minded trier of fact could reasonably conclude that

assigning Plaintiff to use the Vactron machine more than other employees could be unlawful retaliation.

Plaintiff identifies other matters that she believes constitute retaliation. Viewed in isolation, this Court would conclude that they were insufficient to support her retaliation claim. For example, with respect to the claim that Plaintiff was reprimanded for complaining to Peluso, Defendants have offered the legitimate, non-discriminatory reason that Plaintiff was reprimanded for failing to be at her assigned work site without appropriate supervisory approval. Plaintiff fails to submit any evidence suggesting that this reason is untrue or a pretext for unlawful discrimination. It also may be found that the written warnings alone were too trivial to constitute sufficiently material conduct. However, a jury could consider this evidence in conjunction with the other retaliation evidence and conclude that it was part of a pattern of retaliation.

Similar reasons apply to Plaintiff's claims that she was prohibited from going home on February 13, 2003 without first reporting to the nurse, that she received a reprimand for failing to report an on-the-job injury, that she did not promptly report her March 18, 2003 injury, and that she was issued a safety violation in March 2003. In isolation, none of these incidents are sufficiently material to constitute retaliation. There is no indication that any of these incidents caused a materially adverse change in the terms and conditions of her employment or otherwise had a material effect on Plaintiff. With respect to Plaintiff's failure to report an on-the-job injury and her failure to timely report the March 18 injury, Defendants also proffer a legitimate, non-discriminatory reason for its actions (company policy requires prompt reporting of injuries) to which Plaintiff has failed to submit any evidence tending to prove that Defendants' explanation is false or a pretext for unlawful retaliation. While

Defendants may have legitimate reasons for these actions, again, a jury could consider the evidence in its totality and conclude that Defendants were engaged in a pattern of retaliation against Plaintiff.

Thus, considering the totality of the circumstances, Defendants' motion to dismiss the retaliation claim is denied.

### d.  Whether Suen May Be Held Personally Liable Under the HRL

The final issue to be addressed is whether Suen may be held personally liable under the New York State Human Rights Law, N.Y. EXEC. LAW § 296.  While Defendants make a persuasive argument that Suen cannot be held liable under § 296(6) as an aider and abetter because one cannot aid or abet his own conduct, see Strauss v. New York State Dept. of Educ., 26 A.D.3d 67 (3d Dep't 2005), this Court is constrained to follow its previous ruling in Lamere v. New York States Office for the Aging, 2005 WL 1174068, at *15 (N.D.N.Y. 2005), and the rulings of the Second Circuit that held that individuals may be held liable under the Human Rights Law if they are personally involved in the conduct giving rise to the discrimination.  See Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004); Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995) ("[A] defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the HRL."); see also Dawson v. County of Westchester, 351 F. Supp.2d 176, 198-99 (S.D.N.Y. 2004).

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED.

IT IS SO ORDERED.

Dated: June 22, 2006

_____
Thomas J. McAvoy
Senior, U.S. District Judge